**SIGNED THIS: January 29, 2015**

_____

**Mary P. Gorman**
**United States Chief Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

In Re                                    )
                                         )      Case No. 11-72074
STEVEN J. BARFIELD,                      )
                                         )      Chapter 7
                    Debtor.              )

## O P I N I O N

Before the Court is a Motion to Confirm and Pay filed by the successor
Chapter 7 Trustee, Jeana K. Reinbold. The Motion seeks an order confirming a
sale of property by the previous Chapter 7 Trustee, James R. Inghram. The Motion
also seeks authorization to make disbursements from the sale proceeds to the
Debtor, Steven J. Barfield, for his claimed exemptions, and to Quality Turbine
Repair, Inc., for its claimed interest in some of the property sold. The relief is
requested despite the fact that the sale was conducted by Mr. Inghram while an

objection to the sale was pending and before a hearing on the objection could occur. Because Ms. Reinbold has failed to establish that she is entitled to the relief she requests as a matter of law or fact, her Motion will be denied.

## I. Factual and Procedural Background

Steven J. Barfield ("Debtor") filed his voluntary petition under Chapter 7 on August 8, 2011. James R. Inghram was appointed Chapter 7 Trustee. On the Statement of Financial Affairs ("SOFA") filed contemporaneously with his petition, the Debtor identified himself as President and fifty percent owner of Quality Turbine Repair, Inc. ("Quality Turbine"). Dustin Beck was identified as Vice-President and owner of the other half of the business. Also according to the SOFA, Quality Turbine ceased business operations in March 2011, and a lawsuit was pending in state court between Dustin Beck and the Debtor relating to the dissolution of the corporation.

On the schedules filed with his petition, the Debtor valued his interest in Quality Turbine at zero and disclosed ownership of a 2008 Dodge truck valued at $20,000. The Debtor also listed tools and equipment owned by him and a "GLG Scissor lift" which he stated was owned by Quality Turbine. He claimed a $2400 vehicle exemption in the 2008 Dodge truck.

On amended schedules filed in November 2011, the Debtor provided a more detailed itemization of his equipment and tools and valued the items as a group at $10,000. His amended schedules make no mention of any ownership interest of Quality Turbine in any of the items. The Debtor claimed $1500 of the value of

the equipment and tools as exempt under the Illinois tools of the trade exemption and $3750 as exempt using a portion of his Illinois wildcard exemption. No objection to either the Debtor's original or amended claims of exemption was filed.

Shortly after the case was filed, Dustin Beck filed a motion for relief from stay seeking permission to continue the pending state court litigation. Mr. Beck suggested that his purpose in pursuing the state court litigation was to wind up the affairs of Quality Turbine but also asserted that, because the issues he had raised in his state court action were similar to those that would be raised in a complaint to determine dischargeability of debt, he should be allowed to prosecute the issue of the dischargeability of the amounts owed by the Debtor to him and Quality Turbine in state court.[1] The Debtor objected to the motion, arguing that a determination of the dischargeability of his debts was subject to the exclusive jurisdiction of this court. Mr. Inghram also objected, asserting that although a state court action might be proper to wind up the corporation, he was the real party in interest as to the rights of the Debtor in the corporation and any distribution that might be available upon a corporate dissolution. After a brief hearing, the motion for stay relief filed by Dustin Beck was denied without prejudice.

Mr. Inghram promptly began administering the Debtor's estate. He obtained authority to employ an auctioneer. He settled a motion for relief from stay filed by

---

[1] Although the motion for relief from stay requested relief for both Dustin Beck and Quality Turbine, Mr. Beck's attorney, Mark Thielen, entered his appearance only for Mr. Beck. No appearance has ever been filed in this case by Mr. Thielen or anyone else on behalf of Quality Turbine.

State Street Bank and Trust ("State Street Bank") with respect to the Debtor's 2008 Dodge truck with an agreed order giving him until March 2012 to sell the vehicle. He sought and obtained turnover of the Debtor's non-exempt property.

At the request of Mr. Inghram, a claims bar date was set and noticed to all creditors. No claim was ever filed by Quality Turbine. Dustin Beck, however, did file two claims. One claim was in the amount of $17,818.78 for services performed by Mr. Beck for Quality Turbine. The second claim was in the amount of $124,774.97 and identified the basis for the claim as "11 U.S.C. §523(a)(4)." Although Mr. Inghram did not object to either claim, his successor, Ms. Reinbold, recently objected to the claims of Dustin Beck, and both have been disallowed.

The Debtor received his discharge on December 5, 2011. Prior to the issuance of the discharge, Dustin Beck filed an adversary complaint seeking to except the amounts he claimed were owed to him by the Debtor from discharge. The complaint alleged that the Debtor had committed fraud while acting in a fiduciary capacity as an officer, director, and shareholder of Quality Turbine, causing injury to Mr. Beck. More than a year after filing the original complaint, Mr. Beck sought to amend the complaint to add a count asserting a derivative action on behalf of Quality Turbine against the Debtor. The Debtor objected to the motion for leave to amend and, after hearing, the motion was denied. This Court found that the addition of a new count, by essentially a new plaintiff seeking relief under a legal theory not previously asserted, was untimely. The Court found that no effort had been made by Mr. Beck to comply with the statutory requirements which are a pre-condition to filing a derivative action until well after the deadline

to file a dischargeability complaint had passed. Subsequently, at the commencement of the trial on the original complaint, Mr. Thielen appeared for Mr. Beck and voluntarily dismissed the adversary proceeding.

On March 21, 2012, Mr. Inghram filed a Notice of Intent to Abandon with respect to certain items of the Debtor's real and personal property including his Quality Turbine stock. After having been given notice and an opportunity to be heard, no creditors or parties in interest objected to the abandonment by the objection deadline of April 13, 2012. Accordingly, the property was deemed abandoned.

Mr. Inghram also filed a Notice of Intent to Sell on March 21, 2012. The Notice stated that the Debtor's tools and equipment, the 2008 Dodge truck, and other items of personal property would be sold at a public sale on April 21, 2012. The Notice provided that creditors and parties in interest had until April 13, 2012, to object to the proposed public sale.

On the last day of the objection period, Dustin Beck filed an objection to the Notice of Intent to Sell alleging that many of the items scheduled to be sold were the property of Quality Turbine and not the Debtor individually. Mr. Beck's objection further stated that "the issues of ownership, transferring of property and location of property should be resolved prior to said auction."

On April 16, 2012, this Court entered an order stating that "[i]nsufficient time remains between the filing of the objection and the sale date to schedule a hearing before the scheduled sale. However, it is well-settled that assets owned by a corporation are not included in the bankruptcy estate of an individual

shareholder." The order also set the Notice of Intent to Sell and Mr. Beck's objection for hearing on April 26, 2012.

Notwithstanding the Court's order, on April 18, 2012, Mr. Inghram and Mr. Thielen uploaded an agreed order purporting to settle the issues raised by the objection. The proposed agreed order sought to authorize Mr. Inghram to proceed to sell all of the property listed on his Notice of Intent to Sell and further provided "that should Attorney Thielen, on behalf of Dustin Beck, provide this Court with proof that any of the property sold at the public auction is not property of the bankruptcy estate, the sale proceeds of such property (less a pro rata share of the auction expenses) shall be turned over to Attorney Thielen." The Court issued a deficiency notice notifying the parties that the order would not be signed because it granted relief not available based on the documents previously filed.

At the hearing on April 26th, Mr. Inghram admitted that, despite the pending objection of Dustin Beck and the Court's notification that it would not sign the agreed order authorizing the sale to go forward, the public sale was held as scheduled. The Court expressed concern and questioned whether there was any way, under the circumstances, that authority could or should be retroactively granted for the sale. The Court made it clear that Mr. Inghram would have to provide statutory or case law support for any further requested relief related to the administration of the proceeds from the unauthorized sale.

On May 15, 2012, Mr. Inghram filed a Report of Sale for the April 2012 sale and sought compensation for his auctioneer. The matters were set for hearing and an order was entered directing Mr. Inghram to file a memorandum of law

providing authority for the Court to consider a report of sale or approve auctioneer fees for a sale for which no authority to sell had ever been obtained. In response, Mr. Inghram withdrew both the Report of Sale and the Application for Compensation acknowledging that he had no authority for the requested relief.

A second Report of Sale was filed by Mr. Inghram in September 2012 relating only to the sale of the Debtor's 2008 Dodge truck. Mr. Inghram reported that the truck had been sold for $20,000 on April 21st and sought to compensate the auctioneer $2500 for his efforts in completing the sale. Mr. Inghram asserted that the truck had been listed separately on the original Notice of Intent to Sell, that title to the truck was undisputedly held by the Debtor alone, and that Mr. Beck had raised no objection to the sale of the truck. After giving creditors and parties in interest an opportunity to object, the proposed $2500 payment to the auctioneer was approved. The Report of Sale did not disclose any amount paid to the creditor holding a lien on the truck, nor did it mention payment of the Debtor's claimed exemption in the truck.

In April 2013, approximately a year after the public sale occurred, Mr. Inghram filed an adversary complaint against Dustin Beck and Quality Turbine (Adv. No. 13-7021). The complaint recited the history of the case and alleged, *inter alia*, that "neither Plaintiff nor Quality Turbine can accurately determine whether the personal property listed in the Objection was even sold at the April 21, 2012 sale and if sold whether it was property of the bankruptcy estate or property owned by Quality Turbine." Complaint *at* ¶ 20. The complaint went on to state that Quality Turbine believes that the value of its property sold at the public

auction was $2238.50 and that Mr. Inghram was willing to accept that figure in settlement. The complaint prayed that a declaratory judgment be entered determining the extent of the estate's interest in the April 2012 sale proceeds. Attorney Thielen appeared and answered the complaint on behalf of Dustin Beck. No appearance was filed or answer made on behalf of Quality Turbine.

After an initial pre-trial conference, Mr. Inghram moved to amend his complaint. His proposed amended complaint asserted that the April 2012 sale was proper because it had been agreed to by Dustin Beck and Quality Turbine. His amended prayer for relief sought to have the court "[a]pprove the sale held on April 21, 2012" and allow Mr. Inghram to administer the sale proceeds. At a hearing on the motion for leave to file the amended complaint, the Court questioned whether an adversary complaint pending only against Dustin Beck and Quality Turbine was the proper procedural vehicle to revisit the issue of Mr. Inghram's authority to conduct the April 2012 sale in the first place. The Court noted that neither the Debtor nor any other creditor or party in interest was given notice that the relief was being requested. At the conclusion of the hearing, Mr. Inghram's attorney withdrew the motion for leave to amend. Shortly thereafter, Mr. Inghram voluntarily dismissed the adversary proceeding.

On November 27, 2013, Mr. Inghram filed a Notice of Intent to Sell wherein he listed numerous tools, pieces of equipment, and other items of personal property, and proposed to sell each item to named buyers for specific prices. Following this Court's procedures, Mr. Inghram sent notice to all creditors and parties in interest giving them an opportunity to object to the proposed sale.

However, because the Notice of Intent to Sell appeared to propose private sales of the same items which had been sold more than a year before at the unauthorized public sale, a hearing on the Notice of Intent to Sell was set by the Court, *sua sponte*.

Contemporaneously with the Notice of Intent to Sell, Mr. Inghram filed a motion seeking to compromise Dustin Beck's claimed interest in property sold at the April 2012 sale for $2238.50. Interestingly, the motion referred to Mr. Beck's interest in the property rather than Quality Turbine's interest and proposed payment of the settlement amount directly to Mr. Beck rather than to the corporation. The motion to compromise was set for hearing along with the Notice of Intent to Sell.

Prior to the hearing on the proposed private sales and the compromise, a Notice of Appointment of Successor Trustee was filed by the United States Trustee ("UST") whereby Mr. Inghram was removed from the case and Jeana K. Reinbold was named as successor trustee. At the subsequent hearing, Mr. Inghram appeared as did Sabrina Petesch, an attorney for the UST. Ms. Petesch announced that, after conferring with Mr. Inghram, the UST, and general counsel for the Executive Office of the UST, the UST had concluded that Mr. Inghram was in a conflict position and should be removed as trustee from the case. Ms. Petesch stated that her office had appointed Ms. Reinbold as successor trustee and that Ms. Reinbold would fully investigate the case including all potential causes of action against Mr. Inghram relating to the liquidation of estate assets without authority. Based on the appointment of a successor trustee, Mr. Inghram's Motion

to Compromise and Notice of Intent to Sell were denied approval without prejudice.

On June 27, 2014, Ms. Reinbold filed her Motion to Confirm and Pay. In her Motion, Ms. Reinbold asserted that Mr. Inghram complied with the statutory requirements for the April 2012 sale and that this Court should "confirm" the sale. She also claimed that after an "extensive review" of information regarding the sale, she believes that it would be in the best interest of all creditors to allow her to pay Quality Turbine $2238.50 for its assets which were sold and to pay $7650 to the Debtor for his exemptions. Alternatively, she sought authority to issue checks payable to both Quality Turbine and the Debtor for the $2238.50 she thinks Quality Turbine is entitled to receive and for $5250 of the Debtor's exemptions related to the tools and equipment sold at the public sale.

Ms. Reinbold was directed to file a memorandum of law in support of her Motion to Confirm and Pay. Specifically, she was requested to provide authority for the proposition that a court can "confirm" a sale and retroactively approve a sale under the circumstances presented here. Additionally, she was asked for authority on the issue of whether the issuance of joint checks to Quality Turbine and the Debtor, presumably so they would have to go to state court to fight over the money, would not cause Quality Turbine to violate the discharge injunction now in place. With all potential obligations of the Debtor to Quality Turbine appearing to have been discharged, this Court questioned whether there was any legal basis for the issuance of the joint checks. All creditors and parties in interest were also offered an opportunity to respond to the Motion to Confirm and Pay.

Ms. Reinbold filed a Brief in support of her Motion to Confirm and Pay and, at the same time, filed a Report of Sale with respect to the April 2012 sale. In her Brief, Ms. Reinbold argues that due to the acquiescence of Mr. Thielen in the sale going forward despite the pending objection, Mr. Inghram was fully authorized to proceed with the sale and that her Report of Sale and proposed distributions should be approved without further delay. She claims that, under Illinois law, Mr. Inghram entered into a binding agreement with Quality Turbine which should be honored. She also acknowledged that she has no authority for her proposal to issue joint checks to Quality Turbine and the Debtor and has decided not to pursue that course of action.

Dustin Beck filed an Objection to the Motion to Confirm and Pay.[2] Mr. Beck argues that Quality Turbine had a binding agreement with Mr. Inghram to allow the sale to go forward and asserts that the distributions proposed by Ms. Reinbold should be made. He also asks, however, that the April 2012 sale be declared void.

The Debtor also responded to the Motion to Confirm and Pay. He asks only that his claimed exemptions be paid to him.

The issues raised by the Motion to Confirm and Pay are ready for decision.

------

[2] The Objection was electronically filed by Mr. Thielen but was signed only by Dustin Beck. Rule 9011 requires that all papers filed with the court, with limited exceptions not relevant here, "shall be signed by at least one attorney of record in the attorney's individual name." Fed. R. Bankr. P. 9011. Because Mr. Thielen was Mr. Beck's attorney at the time, his signature should have been on the Objection. Because the document was not signed by the attorney of record, it appears to have been filed in violation of Rule 9011. Two days after filing the Objection, Mr. Thielen withdrew as Mr. Beck's attorney in this case.

## II. Jurisdiction

This Court has jurisdiction over the issues presented here pursuant to 28 U.S.C. §1334. Resolution of disputes relating to the administration of the estate, the allowance of exemptions, and the sale and distribution of estate property are core proceedings. 28 U.S.C. §157(b)(2)(A), (B), (N), (O).

## III. Legal Analysis

### A. The Bankruptcy Code and Rules Provide Clear Procedures Chapter 7 Trustees Must Follow for Sales of Estate Property.

Upon the filing of a voluntary petition under Chapter 7, an order for relief is entered and the UST is required to appoint an interim trustee from a panel of private trustees. *See* 11 U.S.C. §§301(b), 701(a)(1); 28 U.S.C. §586(a)(1). If, at the meeting called pursuant to §341, creditors do not elect another person to serve as trustee, then the interim trustee proceeds to serve as the case trustee. *See* 11 U.S.C. §§341(a), 702(d). After appointment, a Chapter 7 trustee is required to "collect and reduce to money the property of the estate[.]" 11 U.S.C. §704(a)(1). One way Chapter 7 trustees reduce estate property to money is by selling the property. The Code and Rules provide clear procedures that Chapter 7 trustees must follow when selling property of the estate.

Trustees may sell property of the estate outside of the ordinary course of business provided that the procedural rules for giving notice and an opportunity to be heard are followed. *See* 11 U.S.C. §363(b)(1). Trustees may sell by private sale or public auction. Fed. R. Bankr. P. 6004(f)(1). Not less than twenty-one days notice of a proposed sale must be given to all creditors. Fed. R. Bankr. P.

2002(a)(2). A notice of intent to sell must describe the property to be sold, include the time and place of a public sale or the terms of a proposed private sale, and must give notice of the time fixed for filing objections. Fed. R. Bankr. P. 2002(c)(1). Unless a court orders otherwise, the date set for the filing of objections must be not less than seven days before the proposed private or public sale is to occur. *See* Fed. R. Bankr. P. 6004(b).

In the absence of any objection, a trustee may proceed with the proposed sale. Generally, when there is no objection to a sale, no court order is required for a trustee to proceed. *In re Claywell*, 341 B.R. 396, 398 (Bankr. D. Conn. 2006)(citing 3 Collier on Bankruptcy ¶ 363.02[1] (15th ed. rev. 2005)). The statutory "notice and hearing" requirement is satisfied when no timely objection or request for a hearing is filed. *See* 11 U.S.C. §102(1)(B)(i). Once authority is obtained for the sale by the giving of notice and the absence of objection, trustees may sign all necessary documents to effectuate the sale, and no additional court order is required. Fed. R. Bankr. P. 6004(f)(2).

Some courts, however, follow a practice of scheduling hearings and entering orders on all sale motions and notices regardless of whether objections have been filed, and such practice is not prohibited by the Code. *See In re VIII South Michigan Associates*, 167 B.R. 877, 879 (N.D. Ill. 1994). This Court does not generally set hearings on sale motions and notices unless objections are filed, but does routinely sign "comfort orders" in the absence of objections which purport to authorize trustees to proceed with sales. Frankly, such orders add little benefit to the process and suggest only that, at least on the face of documents on file, the

form, content, and service of the sale notice at issue appears to comply with the Code and Rules. If that suggestion turns out to be inaccurate because, for example, the property to be sold was incorrectly described or sale terms were misstated in the notice, the comfort order authorizing the sale would be of little value. The comfort order authorizes only the sale specifically described in the notice and would provide no authority to sell different property or to proceed with the sale upon different terms.

If an objection to a proposed sale is filed, the objection is resolved as a contested matter pursuant to Rule 9014. *See* Fed. R. Bankr. P. 6004(b), 9014. In order to resolve an objection, a hearing must be held and court approval for the sale must be obtained before the sale can occur. *See In re Weisser Eyecare, Inc.*, 245 B.R. 844, 848 (Bankr. N.D. Ill. 2000); *Claywell*, 341 B.R. at 398. Because a trustee can only sell under the terms and conditions of the original notice given, the settlement of a sale objection which changes the sale terms or provides for an alternate distribution of sale proceeds must also be noticed so that potential objectors have an opportunity to be heard. *See Weisser Eyecare*, 245 B.R. at 850; Fed. R. Bankr. P. 9014(a), 9019. That is, a court cannot approve a change in sale terms based on an agreement between a trustee and an objector which impacts the rights of other creditors and parties in interest without giving notice to those affected. When an order is entered allowing a sale to proceed after an objection has been heard, the order is automatically stayed for fourteen days unless the order specifically provides for waiver of the stay. Fed. R. Bankr. P. 6004(h).

After a sale has been completed, an itemized statement of the property sold,

the name of each purchaser, and the amount received for each item sold must be filed. Fed. R. Bankr. P. 6004(f)(1). Frequently, the itemization is referred to as a "report of sale" although neither the Code nor the Rules uses that term. In a Chapter 7 case, the report of sale is filed by the trustee or the auctioneer and must be served on the UST. Neither the Code nor the Rules requires that a report of sale be set for hearing or that it be approved by the court. Nothing in the Code or Rules requires further hearing or court order to finalize or "confirm" a sale after it has occurred.

Some courts do enter comfort orders approving reports of sale but, as with notices of intent to sell, such orders do not add anything meaningful to the process. If a trustee obtained authority to sell through the process described above, the comfort order is unnecessary. And if the trustee did not give proper notice in the first place or conducted the sale in a manner inconsistent with the notice given, a comfort order "confirming" the sale would not be the vehicle to remedy such problems.

Although this Court entered comfort orders on reports of sale in the past, its practice now is to expect the reports of sale to be filed and served as required but not to take any action on them. This Court has, however, allowed applications for compensation of auctioneers and real estate brokers to be combined in one document with reports of sale. When compensation is sought, the document is noticed in accordance with the Rules for applications for compensation and, in the absence of objection, orders are entered approving requested compensation. *See* Fed. R. Bankr. P. 2002(a)(6), (c)(2).

The general provisions for trustee sales described above all relate to sales of "property of the estate." Generally, a Chapter 7 trustee may only sell property which has been determined to be "property of the estate." *See In re Spain*, 103 B.R. 286, 294 (N.D. Ala. 1988); *In re McIntyre*, 2014 WL 7359409, at *4 (Bankr. M.D. Ala. Dec. 23, 2014); 11 U.S.C. §363(b). Very limited authority exists for a Chapter 7 trustee to sell property that is not property of the estate.

Under §363(h), when a trustee is selling property of the estate that is co-owned by someone other than the debtor, the trustee may, under certain circumstances, also sell the interest of the co-owner. *See* 11 U.S.C. §363(h). The provision is limited to property in which the debtor's interest at the time the case was commenced was that of a tenant in common, a joint tenant, or a tenant by the entirety, and to property where partition or separation of the estate's interest is impracticable. *Id*. Further, a Chapter 7 trustee, under certain circumstances, may sell property of the estate free and clear of liens and interests of others in the property. *See* 11 U.S.C. §363(f). But the property to be sold must be property of the estate in the first place, and a motion specifically identifying the lien subject to the motion must be filed and served on the lienholder. *Id*.; Fed. R. Bankr. P. 6004(c). These special provisions need not be discussed at length here because, as set forth below, they do not apply to the sale at issue.

Finally, when considering a sale of estate property, a Chapter 7 trustee must determine whether the anticipated sale will yield funds to pay a meaningful dividend to unsecured creditors. When no equity will be left after paying the costs of sale and administration, property should be abandoned rather than sold. *See*

*In re Payne*, 512 B.R. 421, 427 (Bankr. E.D.N.Y. 2014); *McIntyre*, 2014 WL 7359409, at *5; *see also* 11 U.S.C. §554. In calculating whether there is equity, a trustee should consider the amounts of secured claims and exemption claims that will be paid from the proceeds and all costs associated with the sale and the administration of the sale proceeds. Only if a meaningful distribution can be paid from what will be left should the sale proceed. *See Reisz v. Crocker*, 2014 WL 7342686, at *1 (W.D. Ky. Dec. 23, 2014)(citing U.S. Dept. of Justice, Exec. Office of U.S. Trustees, Handbook for Chapter 7 Trustees, pp. 8-20).

This Court has previously opined that Chapter 7 trustees "should be the experts in the procedures required" to sell assets. *In re Trahan*, 460 B.R. 207, 213 (Bankr. C.D. Ill. 2011). Chapter 7 trustees "are required to know, understand, and follow the provisions of the Bankruptcy Code and Rules which govern their conduct." *Id.* Mr. Inghram's conduct and Ms. Reinbold's requested relief must be analyzed under their clear and undisputed duty to know and follow the law with regard to sales of estate property.

**B. Mr. Inghram was not Authorized to Proceed with the Sale of the Assets Referred to in Dustin Beck's Objection without Court Order.**

The Notice of Intent to Sell prepared by Mr. Inghram for the sale set for April 21, 2012, appears to have complied in all material respects with the requirements of the Code and Rules. It included a detailed description of the items to be sold and gave notice of the date, time, and place of the public sale. The Notice of Intent was served on all creditors and parties in interest. The issues which are before this Court arose when an objection was filed by Dustin Beck claiming that some

of the items scheduled to be sold were property of Quality Turbine and not property of the estate.

Once Mr. Beck filed his objection, the authority of Mr. Inghram to conduct the sale as noticed was contested, and resolution of the contested matter required a hearing and the entry of an order. Fed. R. Bankr. P. 6004(b), 9014. The parties were notified that the Court was unable to conduct a hearing before the scheduled sale, that a hearing was set on April 26th, and, after the proposed agreed order was submitted, that the Court would not sign the order allowing the sale to go forward. Nevertheless, the sale occurred. Mr. Inghram has since admitted that he lacked authority to proceed with the sale, and the UST has conceded as much with the removal of Mr. Inghram from the case. Ms. Reinbold, however, now claims that Mr. Inghram had authority to proceed with the sale by reason of his compromise and settlement with Mr. Beck. Ms. Reinbold claims that this Court should have signed the agreed order tendered by the parties before the sale and that, even in the absence of the Court's approval, the parties had a deal that allowed Mr. Inghram to proceed. The Code, Rules, and case law do not support her position.

The proposed agreed order purported to authorize Mr. Inghram to sell property which was alleged to not be property of the estate and provided that, upon Attorney Thielen submitting proof to the Court that some of the property sold was not property of the estate, the net proceeds from the sale of that property would be turned over to Attorney Thielen. The proposed order was defective for a number of reasons, and this Court correctly declined to sign it.

-18-

An obvious problem with the proposed agreed order is that there is simply no authority for a court to authorize a Chapter 7 trustee to sell property which is not property of the estate. Section 363(b) applies only to property of the estate, and the limited exceptions provided by §363(f) and §363(h) have no application here. 11 U.S.C. §363(b), (f), (h). No claim was made that Quality Turbine was a co-owner of some of the property or that it had a lien on the property to be sold. To the contrary, the allegation in Mr. Beck's objection was that some of the items scheduled to be sold were the sole, separate property of Quality Turbine. It is well settled that assets of a corporation are not included in the bankruptcy estate of an individual shareholder. *See In re Billingsley*, 338 B.R. 372, 375 (Bankr. C.D. Ill. 2006). In his role as trustee in this case, Mr. Inghram had no business, no duty, and no authority to sell non-estate property, and no agreement with Mr. Thielen could change that fact.[3] This Court rightly declined to sign an order purporting to approve such a sale.

Another significant problem with the proposed order was that it appeared to establish some sort of post-sale informal procedure for Mr. Thielen to contact

---

[3] There are good reasons why Chapter 7 trustees should not engage in sales of non-estate property. It is axiomatic that one cannot sell and pass title to property one does not own. Here, Mr. Inghram could not pass good title to the assets of Quality Turbine and, because neither Dustin Beck nor Attorney Thielen held title to the disputed assets, they had no ability to confer authority to Mr. Inghram to pass good title. Chapter 7 trustees enjoy limited immunity for acts within the scope of their authority but may be held personally liable for actions taken outside that scope. *See Weisser Eyecare*, 245 B.R. at 851. Chapter 7 trustees are not required to put themselves at risk of personal liability when administering estates and should therefore be extremely cautious about acting outside the bounds of their statutory authority. *See Trahan*, 460 B.R. at 213.

this Court with information regarding ownership of the assets in question. The order said that Mr. Thielen on behalf of Mr. Beck could provide the Court with proof of ownership, but the order did not require the filing of any motions or adversary proceedings to facilitate the submission of such evidence or the giving of any notice to other interested parties. The order also said that, after submission of the proof, the net proceeds from the sale of the disputed items would be paid to Mr. Thielen, even though he represented only one of the shareholders of Quality Turbine. Thus, the proposed order attempted to resolve the dispute between Mr. Beck and the Debtor as to who would be entitled to receive and control funds of their dissolved corporation without giving the Debtor notice or an opportunity to be heard on the matter. All of these problems with the order were, perhaps, the result of seriously inartful drafting. But the proposed agreed order said what it said, and if an agreement more in line with the requirements of due process was actually intended, then the parties should have been more careful in their drafting. Again, the proposed agreed order was rightly rejected by this Court.

A further problem with both the proposed agreed order and the whole issue of whether Mr. Inghram and Mr. Thielen could settle the issues in a way that would bind this Court and other parties who received no notice, as Ms. Reinbold alleges they could, is the extent of authority each of them had at the time. Mr. Inghram's authority to sell was limited to conducting a sale upon the terms set forth in his Notice of Intent to Sell. He had no authority to conduct a sale without strict adherence to the notice procedures, and Mr. Thielen could not convey that authority on him by agreement. *See Weisser Eyecare*, 245 B.R. at 850. Mr.

Inghram's agreement to transfer a portion of the sale proceeds to one shareholder of Quality Turbine was not an ordinary course transaction and, therefore, could not be binding on the estate unless notice and an opportunity to be heard had been given to all parties in interest. *See id.*; Fed. R. Bankr. P. 9019.

Mr. Thielen's authority to enter into a binding agreement for the sale of the property of Quality Turbine is equally suspect. Mr. Thielen formally appeared in this case for Dustin Beck. And although he attempted from time to time to assert the rights of Quality Turbine, neither he nor anyone else ever formally appeared for Quality Turbine. The Debtor's interest in Quality Turbine became property of the estate when the case was filed. 11 U.S.C. §541(a)(1). But at the same time Mr. Inghram filed his Notice of Intent to Sell, he also filed a Notice of Abandonment which included the Debtor's Quality Turbine stock. When no objection to the Notice of Abandonment was filed by the deadline of April 13, 2012, the stock was deemed abandoned. 11 U.S.C. §554; Fed. R. Bankr. P. 6007(a). Thus, when just a few days later Mr. Inghram and Mr. Thielen were discussing the sale of Quality Turbine property, they failed to include a key party in their conversation. Due to the abandonment, the Debtor had again become the owner of the stock and a party in interest with respect to Quality Turbine matters. *See* 11 U.S.C. §554; *In re Ring*, 138 F. App'x 834, 837, 2005 WL 1526462, at *2 (7th Cir. 2005)(property of the estate reverts to debtor if trustee abandons it); *In re Abma*, 215 B.R. 148, 152 (Bankr. N.D. Ill. 1997). The Debtor's exclusion from the process rendered any purported deal on behalf of Quality Turbine unenforceable.

Ms. Reinbold's continued insistence that Mr. Thielen entered into a binding

agreement on behalf of Quality Turbine is not supported by the law or facts. Interestingly, although arguing in her brief that a binding agreement was made on behalf of Quality Turbine by Mr. Beck's attorney, Ms. Reinbold also challenges Mr. Beck's standing to have raised the objection on behalf of Quality Turbine in the first place. Ms. Reinbold has objected to the claims filed by Dustin Beck, and both claims have been disallowed. Accordingly, whatever his standing was in 2012, Mr. Beck no longer has an interest in the outcome of this case as he will not share in any dividend that may be paid. Thus, Ms. Reinbold's argument undercuts her current position that there is still some controversy pending in this case with Dustin Beck or Quality Turbine that must be compromised. But Mr. Inghram did not raise the issue of standing in response to Mr. Beck's sale objection and, even if he had, a hearing would have been necessary to resolve the issue and a court order would still have been required to allow the sale to go forward. In the absence of the required hearing and court order, Mr. Inghram was not authorized to proceed with the sale.[4]

Notwithstanding the obvious problems with the April 2012 sale, Ms. Reinbold urges this Court to "confirm" the sale. Without citation to any meaningful authority, Ms. Reinbold suggests that this Court can overlook all past problems and, by confirming the sale at this late date, allow her to proceed to make distributions and ultimately close the case. But there is no such thing as

---

[4] Mr. Inghram and Mr. Thielen did not include a waiver of the fourteen day stay in their proposed agreed order and, accordingly, even if the order had been entered, the sale would still have had to have been continued until the stay expired. Fed. R. Bankr. P. 6004(h).

-22-

confirming a sale for the purpose of rectifying mistakes in the original noticing of the sale. Either Mr. Inghram had authority to proceed with the sale of the disputed items or he did not have such authority. If he did have authority, he is required to file a report of sale which needs no approval. Fed. R. Bankr. P. 6004(f)(1). But if he had no authority to sell in the first place, filing a report detailing the unauthorized sale does nothing to cure the problem.

Ms. Reinbold also appears to be suggesting that, because the Court identified the problems here, the Court has a duty to craft a remedy. But this Court has previously rejected such arguments when made by another trustee who acted without authority. *See Trahan*, 460 B.R. at 211-13. Trustees "are responsible for understanding the boundaries of a panel trustee's power and authority" and for ensuring that those boundaries are not exceeded. *In re Cent. Ill. Energy, L.L.C.*, 406 B.R. 371, 373 (Bankr. C.D. Ill. 2008)(Perkins, J.); *Trahan*, 460 B.R. at 213. The boundaries must be observed regardless of any perceived benefit to the estate by reason of the trustee's actions. *Id.* A trustee who obtains control of funds in a manner beyond the scope of his authority is not entitled to have this Court provide cover by placing a stamp of approval on a proposed distribution of such funds. *Trahan*, 460 B.R. at 210. There is no process of "confirmation" of the April 2012 sale that will retroactively make right all the things that were wrong with that sale.

### C. Ms. Reinbold is not Entitled to an Order Authorizing her to Pay the Debtor's Vehicle Exemption.

Generally, trustees pay exemptions to debtors from sale proceeds promptly

upon completion of a sale. If no objection to a claim of exemption is timely filed, the exemption is allowed. 11 U.S.C. §522(b)(2), (l); Fed. R. Bankr P. 4003(a), (b). Here, the Debtor claimed a $2400 Illinois vehicle exemption in his 2008 Dodge truck. *See* 735 ILCS 5/12-1001(c). No objection to the claim of exemption was filed, and the exemption amount is clearly due to the Debtor.

A problem arises here, however, because of the failure of both Mr. Inghram and Ms. Reinbold to provide a complete accounting of the truck sale. Based on the limited and contradictory information which has been provided, a strong likelihood exists that the Debtor's truck was sold for less than the amount needed to break even on the sale. This Court has already entered an order agreeing with Mr. Inghram that the sale of the truck was separate from the sale of the disputed tools and equipment. If Ms. Reinbold is holding funds from the sale of the truck from which the Debtor's exemption could be paid, she would need no additional order from this Court to pay the exemption. But it appears that she may not be holding enough money from the truck sale to make the payment and is really seeking authority to use proceeds from the unauthorized tool and equipment sale to make the Debtor whole on the sale of his truck.

When Mr. Inghram filed his report of sale on the truck in September 2012, he reported that he had received $20,000 for the truck and wanted authority to pay his auctioneer a 12.5% commission of $2500. Mr. Inghram did not disclose the amount paid to State Street Bank to satisfy its lien on the truck nor did he reference the Debtor's entitlement to an exemption. Ultimately, an order was entered approving the auctioneer's compensation.

But Ms. Reinbold now reports in her Motion to Confirm and Pay that $15,942.21 was paid by Mr. Inghram to State Street Bank. If that information is correct, and if Mr. Inghram also paid his auctioneer the $2500 he was authorized to pay, then Ms. Reinbold would have only $1557.79 on hand from the truck sale to satisfy the Debtor's $2400 exemption claim. In her Motion and Brief, however, Ms. Reinbold makes no mention of the auctioneer's fee. Instead, she claims that after payment of the secured debt against the truck, she has surplus funds on hand to pay the Debtor's exemption.[5] Although her request is phrased as simply seeking a comfort order, she is not entitled to any such order under the facts so far presented.

This newly disclosed problem raises the question of why the truck was sold in the first place. When the Debtor filed this case, he scheduled his 2008 Dodge truck as having a $20,000 value and listed State Street Bank's lien in the amount of $21,000. When State Street Bank filed for stay relief in November 2011, it claimed that as of the case filing in August 2011, it was owed approximately $13,700. Although learning that the secured debt was lower than previously claimed may have caused Mr. Inghram, at least at first blush, to think there was some equity in the truck, more analysis was required. Mr. Inghram knew that he

---

[5] In addition to not considering the auctioneer's commission in calculating whether she has surplus proceeds from the truck sale, Ms. Reinbold appears to also have overlooked the auctioneer's expenses. When Mr. Inghram filed his Application for Compensation of the auctioneer in May 2012, he disclosed that the auctioneer had incurred $3150.98 in reimbursable expenses related to the sale. A $210 expense for storage and a $150 expense for detailing relate directly to the truck sale. Mr. Inghram withdrew the Application and, accordingly, these expenses apparently remain unpaid.

was hiring an auctioneer at a 12.5% commission rate, that the Debtor had already been allowed his $2400 exemption, and that State Street Bank had incurred fees and costs to bring its stay relief motion and would continue to accrue interest and late charges until paid. Further, if the truck sold for the $20,000 estimated value, Mr. Inghram would have been entitled to a trustee's commission on all disbursements except for the funds going back to the Debtor, which would have amounted to $2510.[6] Thus, as early as November 2011, Mr. Inghram could have calculated that he would need at least $21,000 to break even on the truck sale. It is hard to understand why then in April 2012 he apparently failed to get a pre-sale payoff figure from State Street Bank, placed no minimum bid on the truck sale, and sold the truck for $20,000.

Ms. Reinbold must provide a complete accounting of the truck sale before any further motions can be considered relating to the disbursement of the truck sale proceeds. Both Mr. Inghram and Ms. Reinbold know that the sale should not have occurred unless a clear benefit to the estate was going to accrue from the sale. Without enough funds left to pay the Debtor's exemption, sale costs, and trustee fees, some explanation must be provided as to why the truck sale occurred. Much more detailed information must be provided by both Mr. Inghram and Ms. Reinbold before this issue can be fully resolved.

---

[6] The commission would be allowed on $17,600 in disbursements ($20,000-$2400) and would be calculated at 25% on the first $5000 ($1250) and 10% on amounts over $5000 but not more than $50,000 ($1260). 11 U.S.C. §326(a).

### D. The Motion to Confirm and Pay Must be Denied.

This Court is not unsympathetic to Ms. Reinbold's difficult assignment in this case. She is charged with resolving a series of problems, none of which were of her own making. But her complaint that, if the Court does not grant her Motion, creditors will suffer and she may be forced to pursue action against Mr. Inghram does not form a basis to grant her the relief she has requested.

Ms. Reinbold has not fully and adequately presented the facts and figures associated with the April 2012 sale. Instead, she has provided confusing information about the truck sale proceeds, suggesting that there are surplus proceeds from the sale without accounting for the estate's potential obligation to pay outstanding auctioneer's commissions and expenses. Likewise, she appears not to have calculated whether, even if the Court granted her some or all of the relief she requests, there would be any benefit to unsecured creditors in continuing with the administration of this estate.

Looking at the sale as a whole, $35,777 in total proceeds were received. Based on those gross proceeds, the auctioneer would have been entitled — and still may be entitled — to $4472.19 in commissions and $3150.98 for his expenses. The Debtor was entitled to his $2400 vehicle exemption and $5250 in exemptions in his tools and equipment. *See* 735 ILCS 5/12-1001(b), (c), (d). State Street Bank's payoff on the 2008 Dodge truck was $15,942.21. A trustee's statutory commission on the disbursements other than those to the Debtor would

–27–

be $3562.75.[7] Subtracting these expected and knowable expenses results in a maximum potential net for the estate of $999.37. That amount represented a very thin margin for the sale and the potential for Mr. Inghram to pay only an extremely modest dividend to unsecured creditors even if there had been no objection to the sale. Once Dustin Beck objected claiming that some of the assets to be sold were not property of the estate, Mr. Inghram should have stopped the sale not only because he was legally obligated to stop and await a court order, but also because he had a duty to recalculate the benefit to the estate of going forward. Unfortunately, he failed to make that calculation.

Mr. Inghram requested permission to disburse $2238.50 to Quality Turbine on several occasions, first through his adversary complaint and later by his motion to compromise with Dustin Beck filed in November 2013. He never, however, disclosed that the disbursement would result in the sale being a net loss to the estate. At this point, Mr. Inghram may not be expecting a commission but he certainly was expecting to be paid a full commission when he went forward with the sale and later agreed to disburse $2238.50 to Quality Turbine. But it is clear that if he had obtained authority to proceed each step of the way as he requested, no funds would be available from the sale to pay unsecured creditors. With only $999.37 in sale proceeds projected to be left after payment of the Debtor's exemptions, the secured creditor, the auctioneer's fees and expenses, and

---

[7] The commission would be allowed on $28,127.50 in disbursements ($35,777.50 - $7650) and would be calculated at 25% on the first $5000 ($1250) and 10% on amounts over $5000 but not more that $50,000 ($2312.75). 11 U.S.C. §326(a).

his own trustee commission, Mr. Inghram could not have paid $2238.50 to Quality Turbine and still have been able to pay a dividend to unsecured creditors from the sale proceeds.

The fact that Mr. Inghram went forward with the sale without court order and without any calculation of whether there would be a benefit to the estate is troubling. The fact that, throughout several years of adversary proceedings and motions, Mr. Inghram never disclosed that the sale proceeds were inadequate to make the disbursements he was requesting to make and to pay other costs that must be paid is even more troubling.

Ms. Reinbold is faced with the difficult task of deciding how to proceed. It seems obvious that the sale proceeds have become burdensome to the estate, and abandonment to the Debtor may be an option. The Debtor is entitled to a significant portion of the funds for his exemptions in any event. This Court recognizes that many trustees, including Mr. Inghram and Ms. Reinbold, are often loathe to abandon assets, and the idea of abandoning the sale proceeds at this point would be hard for either of them to accept. But it is just such an aversion to abandonment that likely caused some of the problems here.

Trustees must look closely at all projected costs of sale and of administration before proceeding with a sale. If nothing will be left after the sale, the property involved should be abandoned. 11 U.S.C. §554(a). Too often, however, although a trustee may see the lack of equity after costs are considered, the trustee believes that a debtor will receive a windfall if property is abandoned. Thus, the trustee proceeds with an unprofitable sale. But that approach is

misguided. No bankruptcy policy or public policy compels a trustee to take assets from a debtor and sell them simply to make sure that the debtor retains no property over allowed exemptions. When costs exceed benefit, trustees should not pursue sales, litigation, or any other collection activities on behalf of an estate. *See Matter of Taxman Clothing Co.*, 49 F.3d 310, 315 (7th Cir. 1995). A trustee's duty is to maximize the value of the estate, and abandonment of burdensome assets is sometimes required to fulfill that duty. *Id.*

Mr. Inghram saw equity here where none existed. There was never any meaningful equity in the Debtor's 2008 Dodge truck. And there was always little to be gained by selling the tools and equipment once the overall sale costs and the Debtor's exemptions were considered. But if the truck had been abandoned, the sale of the tools and equipment as initially planned might have actually yielded a small dividend to unsecured creditors. Thus, abandonment of the truck might well have served the purpose of maximizing value to this estate. But that was not done, and once an objection to the sale was filed, the determination of whether any value would inure to the estate from the sale had to be recalculated. The recalculation could only be redone correctly, however, after a decision was made as to whether the property being sold was actually property of the estate or not. It is for exactly that reason that the sale objection of Mr. Beck had to be resolved before the sale occurred. Deciding to just go ahead and sort it all out later was a reckless choice which has resulted in a loss to the estate.

Abandoning the sale proceeds is not Ms. Reinbold's only option. In her Brief, she discusses the possibility of having the unauthorized sale declared void. There

is authority to support such an action. *See Weisser Eyecare*, 245 B.R. at 850. But as a practical matter it seems unlikely that undertaking such action would be prudent. The various tools and pieces of equipment were sold to dozens of different buyers, and many items were sold for less than $25 each. Tracking down the buyers more than two years after the sale would be difficult, and finding the items actually sold would be challenging as most of the items had no serial number or other identifying characteristics. It is also unclear whether Ms. Reinbold has enough funds in her possession to buy back the items even if she could find them. Further, voiding the sale could unfairly tarnish the reputation of the auctioneer who sold the property at Mr. Inghram's direction and might have an adverse impact on the profitability of future bankruptcy sales in this area. The finality of bankruptcy sales is key to drawing buyers to the sales and making the sales successful.

Ms. Reinbold also suggests in her Brief that if this Court finds that there was no authority to authorize Mr. Inghram to proceed with the sale of non-estate property, such a finding would be the equivalent of finding that no authorization was necessary. She then says that if obtaining authority to proceed was unnecessary, Mr. Inghram acted properly and, as his successor, she should be free to distribute the agreed sum to Quality Turbine and to wrap up this estate. But there is no fair reading of this Court's findings that would allow Ms. Reinbold to rely on this circular reasoning. The reality is that there is no binding agreement with Quality Turbine to enforce. The amount of $2238.50 was agreed to only by Mr. Beck who did not have the authority to bind the corporation. Further, when

the objection to the sale was filed, it related to virtually all of the property listed on the Notice of Intent. Thus, Mr. Inghram was prohibited from selling any of that property until the respective interests were determined. Putting this Court's stamp of approval on the unauthorized sale now would render all the provisions of the Code and Rules governing sales meaningless.

Ms. Reinbold needs to make a thorough review and accounting of the April 2012 sale. Then she must determine whether she can justify continuing with administration of this estate.[8] As it is unlikely that she can obtain approval for the unauthorized sale or the distribution of the sale proceeds, she must consider her limited options and make the best decision to maximize value to the estate. In the meantime, no relief can be granted to her.

## IV. Conclusion

Because Ms. Reinbold has not established her entitlement to the relief she has requested, her Motion to Confirm and Pay will be denied.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

### 

---

[8] Ms. Reinbold's most recent UST Quarterly Report discloses that Mr. Inghram also collected a $5000 receivable owed to the Debtor. Administration of that asset might be beneficial if it is used to pay unsecured creditors. But Ms. Reinbold must sort out the disposition of the sale proceeds and the payment, waiver, or disallowance of whatever sale costs remain unpaid before she can propose payment of a dividend to unsecured creditors.